## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

**WINDY A. GAYFIELD**                    **CIV. ACTION NO. 3:22-00375**

**VERSUS**                                **JUDGE TERRY A. DOUGHTY**

**KILOLO KIJAKAZI, ACTING**              **MAG. JUDGE KAYLA D. MCCLUSKY**
**COMMISSIONER, U.S. SOCIAL**
**SECURITY ADMINISTRATION**

### REPORT AND RECOMMENDATION

Before the court is Plaintiff' petition for review of the Commissioner's denial of social

security disability benefits.  The district court referred the matter to the undersigned United

States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of

the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

### Background & Procedural History

Windy Gayfield filed the instant application for Title II disability insurance benefits on

October 4, 2017.  (Tr. 274-275).  Owens, who was 45 years old at the time of the third

administrative hearing, asserted a disability onset date of September 16, 2017, because of injury

to her left shoulder, injury to her left hip, and problems with recovery.  *See* Tr. 19, 339.  The

state agency denied the claim initially on November 15, 2017.  (Tr. 58-68, 110-113).  Thereafter,

Gayfield requested and received a December 3, 2018 hearing before an Administrative Law

Judge ("ALJ").  *See* Tr. 72.[1]  In a February 25, 2019 written decision, the ALJ determined that

Gayfield was not disabled under the Social Security Act, finding at step four of the sequential

---

[1] The court was unable to locate a transcript of the December 3, 2018 hearing in the
administrative record.

evaluation process that she was able to return to past relevant work, or, alternatively, at step five, that she was able to make an adjustment to work that exists in significant numbers in the national economy. (Tr. 69-80). Gayfield petitioned the Appeals Council to review the unfavorable decision. On January 4, 2020, the Appeals Council granted the request for review, vacated the ALJ decision, and remanded the case for further proceedings, with instructions to give further consideration to whether the claimant had past relevant work and to obtain supplemental vocational expert evidence, if warranted. (Tr. 85-88).

Pursuant to the remand order, the same ALJ held a second administrative hearing on June 1, 2020. (Tr. 38-57). However, in a June 26, 2020 written decision, the ALJ again determined that Gayfield was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in significant numbers in the national economy. (Tr. 89-100). Gayfield petitioned the Appeals Council to review the unfavorable decision. On December 11, 2020, the Appeals Council again granted the request for review, vacated the ALJ decision, and remanded the case for further proceedings before a different ALJ, with instructions to obtain supplemental vocational expert evidence, if warranted. (Tr. 105-107).

Pursuant to the second remand order, a different ALJ held a third administrative hearing on July 6, 2021. (Tr. 28-37). However, in an August 5, 2021 written decision, the new ALJ determined that Gayfield was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in significant numbers in the national economy. (Tr. 10-21). Gayfield appealed the adverse decision to the Appeals Council. On December 7, 2021, however, the Appeals Council denied Gayfield's request for review; thus, the ALJ's decision became the final decision of the

2

Commissioner.  (Tr. 1-3).

On February 5, 2022, Gayfield filed the instant complaint for judicial review of the Commissioner's final decision.  Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

## Standard of Review

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence.  *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted).  The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.  Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla."  It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, ___ U.S.___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations.  *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983).  In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision.  *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452

3

(5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1)(A). A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

4

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4)    If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)    If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.  If the individual can make such an adjustment, then he or she will be found not disabled.  If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps.  20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step."  *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

### I.    Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.  (Tr. 15).  At step two, he found that the claimant suffered severe impairments of osteoarthritis, tendonitis, left hip degenerative joint disease, lumbar degenerative disc disease, and obesity.  *Id*.  He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  (Tr.

5

15-16).

## II.    Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform sedentary work,[2] "except the claimant would need a sit/stand option as part of her employment (sit for 30 minutes at a time and then stand for one minute at a time)."  (Tr. 16-19).

## III.    Steps Four and Five

With the assistance of a vocational expert ("VE") the ALJ determined at step four of the sequential evaluation process that the claimant was unable to return to past relevant work.  (Tr. 19).  Accordingly, he proceeded to step five.  At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education.  *Id.*  Transferability of skills was not material to the decision.  *Id*.

The ALJ next observed that given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. §§ 404.1569, 416.969; Table 1, Rule 201.21,

---

[2] Sedentary work entails:

> . . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

Appendix 2, Subpart P, Regulations No. 4; Tr. 19-20.  However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a VE to determine whether, and to what extent the additional limitations eroded the occupational base for work.  *Id.*  In response, the VE identified the representative jobs of **surveillance system monitor**, *Dictionary of Occupational Titles* ("DOT") Code # 379.367-010; **document specialist**, DOT # 249.587-018; and **press clipping trimmer**, DOT # 249.587-014.  (Tr. 20, 32-33).[3]

## Non-Exhaustive Chronology of Potentially Relevant Medical Evidence

On February 2, 2017, Gayfield went to the emergency department at Morehouse General Hospital after she slipped and fell at work and landed on her left side.  (Tr. 454-457).  She complained of left hip pain, which she described as a 5 in severity on a 10 point-scale.  *Id.*  Upon examination, her range of motion was limited in her back.  *Id.*  An x-ray of the hip showed mild, bilateral hip osteoarthritis.  (Tr. 458-459).  She was diagnosed with a contusion of the left hip and discharged.  (Tr. 454-457).

On February 27, 2017, Gayfield returned to the Morehouse General Hospital emergency department with complaints of left hip pain for the past four days.  (Tr. 460-464).  She described her pain as a 6 on a 10-point scale.  *Id.*  Her pain had improved after her fall, but then returned about four days previously.  *Id.*  The pain was an aching, intermittent pain.  *Id.*  At worst, however, her symptoms were moderate.  *Id.*  Straight leg raises were negative.  *Id.*  An x-ray of the lumbo-sacral spine was normal.  (Tr. 467-467).  The physician advised her to see a

---

[3] The VE responded that for the surveillance system monitor, document specialist, and press clipping trimmer jobs there were 21,000, 19,000, and 12,000 positions available nationwide, respectively.  (Tr. 32-33).  This incidence of work constitutes a significant number (and range) of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

chiropractor if her symptoms did not improve. (Tr. 460-464).

On March 10, 2017, Gayfield saw Steven Bryant, D.C., for complaints of discomfort and/or paresthesia in her lumbar left sacroiliac, and left pelvic regions. (Tr. 467-470). Gayfield described the pain as moderate and rated it as a 7 on a 10-point scale. *Id.* On examination, Gayfield exhibited a significant decrease in normal range of motion in the lumbodorsal extension, right lateral lumbar flexion, left lateral lumbar flexion, and right lumbodorsal rotation areas. *Id.* Bryant advised Gayfield to ice the affected areas for 20-30 minutes for two to three times per day. *Id.*

Gayfield returned to Dr. Bryant on March 13, 2017. (Tr. 470-474). Her prognosis was fair, and continued improvement was expected. *Id.*

Gayfield returned to Dr. Bryant two days later on March 16, 2017, with complaints of discomfort and/or paresthesia in the lumbar, left sacroiliac, and left pelvic areas. (Tr. 475-476). Her pain was a 5 on a 10-point scale, which she described as moderate. *Id.*

Gayfield proceeded to see Dr. Bryant on 32 occasions between March 20 and June 19, 2017, with similar complaints and treatment modalities. (Tr. 477-544). In her initial treatment sessions, she described her pain as a 5 on a 10-point scale, but then, over time, it slowly decreased to a 1. *Id.* On June 19, 2017, however, her pain jumped up to a 4 on a 10-point scale. (Tr. 543). Nonetheless, Bryant indicated that she still was progressing satisfactorily. *Id.*

On July 28, 2017, Gayfield saw Douglas Brown, M.D., for her left shoulder pain and left hip pain. (Tr. 549-551, 573-575). She described her pain as aching, burning, and a 6 on a 10-point scale. (Tr. 553). She had tenderness on palpation of the muscles in her left shoulder. (Tr. 549-551). She also had a tender hip on palpation. *Id.* Her gait and stance were normal. *Id.* A shoulder x-ray showed narrowing of the left shoulder joint space. *Id.* A hip x-ray showed no

radiographic evidence of any osteoarticular abnormality.  *Id.*  Brown ordered an MRI of the left

shoulder and her left hip.  *Id.*  He limited her to "light duty."  *Id.*

On August 29, 2017, Gayfield returned to Dr. Brown to review her MRI results.  (Tr.

545-546, 576-577).  She reported that she still had pain, especially with activity.  *Id.*  On

examination, she had left shoulder swelling, plus tenderness on palpation.  *Id.*  She also had left

hip tenderness.  *Id.*  Her range of motion, however, was normal.  *Id.*  No muscle atrophy was

seen, and there was no lower extremity weakness.  *Id.*  She had a normal gait and stance.  *Id.*  An

MRI of the left shoulder showed minimal tendonitis of the supraspinatus tendon and minimal

fluid in the subacromial bursa.  *Id.*  There was no significant rotator cuff tear.  *Id.*  An MRI of the

left hip showed minimal inflammation of the common hamstring tendon.  *Id.*  Brown discerned

no acute internal derangement of the hip or surrounding structures.  *Id.*  Brown instructed her to

begin physical therapy for her shoulder and hip and to continue light duty.  *Id.*

On September 18, 2017, Gayfield saw Blake Brown, PT.  (Tr. 570-571).  She reported

that she had received short-term relief from her prior treatments with the chiropractor.  *Id.*  A

steroid injection from Dr. Brown on August 29 had provided her with no pain relief.  *Id.*  Her

main complaints were left shoulder and left hip pain with lifting 40-pound salt bags and 20-

pound fluid bags at work.  *Id*.  Her pain was a 6/10 now, 2/10 at its best, and 10/10 at its worst.

*Id.*  Her hip range of motion was within normal limits.  *Id.*  Gayfield completed a questionnaire

which indicated 45 percent impairment of her shoulder, and 81.25% impairment of her lower

extremity.  *Id.*

Gayfield saw Dr. Brown on September 26, 2017, for her left shoulder and left hip pain.

(Tr. 547-548, 578-579).  She had pain in the right shoulder joint and on the left in the

acromioclavicular joint, which was worse on rising.  *Id.*  The pain appeared at night and caused

inability to sleep.  *Id.*  The shoulder joint felt unstable on the left.  *Id.*  Her left hip and left

shoulder were tender on palpation.  *Id.*  Her gait and stance were normal. *Id.*  No pain was

elicited by hip motion.  *Id.*  Brown assessed rotator cuff tendonitis – left impingement syndrome

with partial tear.  *Id.*  She was to remain on light duty, and to recheck in three weeks.  *Id.*

On October 17, 2017, Gayfield returned to Dr. Brown for her left shoulder and left hip

pain. (Tr. 580-581).  Her symptoms remained unchanged.  *Id.*  Dr. Brown ordered a functional

capacity evaluation and noted that she had been off of work.  *Id.*  He assessed her with rotator

cuff tendonitis – left impingement syndrome with partial tear and left hamstring tendonitis.  *Id.*

On November 13, 2017, non-examining agency physician, James Crout, M.D., reviewed

the record and completed a residual functional capacity assessment form indicating that Gayfield

occasionally could lift up to twenty pounds, frequently lift up to ten pounds, stand and/or walk

for a total of four hours, and sit for a total of six hours.  (Tr. 64-66).  She was limited to frequent

climbing ramps/stairs, balancing, crouching, and crawling.  *Id.*  Climbing ladders, ropes, and

scaffolds, plus stooping and kneeling were limited to occasional.  *Id.*  Reaching in any direction

was limited to frequently.  *Id.*

Gayfield next saw Dr. Brown on February 8, 2018, for her low back pain and left leg

pain. (Tr. 586-589).  She was in pain 75 percent of the time.  *Id.*  She still had left shoulder and

left hip pain and was limping.  *Id.*  She also complained of low back pain with her legs going out

from under her.  *Id.*  Lumbosacral spine motion was normal.  *Id.*  Straight leg testing was

negative.  *Id.*  Her left hip was not dislocated, and there was no laxity.  *Id.*  No instability was

noted.  *Id.*  She had a normal gait and stance.  *Id.*  Brown assessed rotator cuff tendonitis – left

impingement syndrome with partial tear, lumbar disc degeneration, and left hamstring tendonitis.

*Id.*  He gave her an injection in her left shoulder joint.  *Id.*  He also ordered a lumbar MRI, more

physical therapy, and that she was off work.  *Id.*

A February 16, 2018 MRI of the lumbar spine showed minimal spondylosis at L4-5, with no nerve root impingement.  (Tr. 594).

On February 19, 2018, Gayfield returned to Blake Brown, PT.  (Tr. 596-597).  Her main left shoulder complaints were intermittent.  *Id.*  Her main lower back pain complaints were occasional throbbing pain from left posterior-lateral hip to knee.  *Id.*  Sometimes her entire leg felt numb when she awakened and stayed that way all day.  *Id.*  Prolonged standing increased her low back pain and left lower extremity radiculopathy.  *Id.*  Her low back pain was relieved with position change.  *Id.*

On March 5, 2018, Gayfield returned to Dr. Brown for her low back pain and left leg pain.  (Tr. 601-603).  Her low back pain was worsening.  *Id.*  She still had left hip joint pain and stiffness on the left.  *Id.*  She was limping, but her gait and station were normal.  *Id.*  Brown assessed rotator cuff tendonitis – left impingement syndrome with partial tear and lumbar disc degeneration, and left hamstring tendonitis.  *Id.*  Brown planned  a left L4-5 TF-ESI and for her to remain off of work.  *Id.*

On March 6 2018, Blake Brown, PT, noted that Gayfield was progressing well and had met six of seven goals.  (Tr. 605-606).  She continued to have pain and would benefit from the six remaining treatment sessions.  *Id.*

On March 9, 2018, Dr. Brown performed a left L4-5 transforaminal epidural steroid injection to treat Gayfield's left L4-5 bulging disc with radiculopathy.  (Tr. 612).

On March 19, 2018, Gayfield returned to Dr. Brown where she reported two days' worth of 50 percent relief after the injection.  (Tr. 622-624).  Her gait and station were normal.  *Id.*  Dr. Brown recommended a left shoulder scope, to remain off work, and a referral to Dr. Alvernia.

11

*Id.*

By March 21, 2018, Gayfield had exhausted her twelve physical therapy sessions and was discharged.  (Tr. 620).

On April 24, 2019, Gayfield saw Brian Bulloch, M.D., for a second opinion for her left shoulder.  (Tr. 639-641).  Bulloch was able to achieve full passive mobilization of the shoulder. *Id.*  Impingement signs were moderately positive, but not severely so. *Id.*  He observed no obvious strength deficits regarding the rotator cuff musculature. *Id.*  His impression was evidence of cervicalgia with rotator cuff tendinopathy with some mild biceps tendinitis clinically involving the left shoulder. *Id.*  Bulloch thought that Dr. Brown's shoulder arthroscope was reasonable, but not required. *Id.*  The chance of benefit from the arthroscope was 50/50 at best. *Id.*  Bulloch saw no other appropriate intervention regarding the shoulder at that point. *Id.*  He concluded that if Gayfield felt like she was not capable of going back to her previous occupation, then an FCE would be appropriate. *Id.*

On May 8, 2018, Gayfield saw Jorge Alvernia-Silva, M.D., for her back pain.  (Tr. 643-647).  She reported that her pain came and went. *Id.*  Her back pain was worsening and it was radiating to her left leg. *Id.*  The pain was improved by lying down and sitting sideways. *Id.*  Sitting worsened the pain in the lower back. *Id.*  Walking made the pain worse in her left leg. *Id.*  Dr. Alvernia assessed her with back pain, leg pain, lumbar spondylosis, and leg swelling. *Id.*  He recommended additional testing. *Id.*

On May 21, 2018, Gayfield returned to Dr. Brown and reported that she had obtained a second opinion from Dr. Bulloch who told her that no surgery was available that could help her pain.  (Tr. 636-638).  Dr. Brown recommended home exercises. *Id.*  He added that she was restricted to medium work, with no overhead left arm. *Id.*  However, she remained off work, and

surgery had been denied. *Id.* Dr. Alvernia was to follow Gayfield and to determine her ability to work. *Id.*

On May 30, 2018, Gayfield was seen by Paul Roberts, FNPC, at Louisiana Pain Care ("LPC"),[4] as a new patient for her low back pain. (Tr. 656-658). Gayfield reported 90 percent low back pain with occasional pain to the left leg. *Id.* The remaining ten percent of pain was occasional radiculitis down the left leg. *Id.* She stated that she had been experiencing this pain ever since she slipped and fell at work on February 2, 2017. *Id.* She added that she had been off work ever since she fell. *Id.* Roberts/Ledbetter observed that Gayfield ambulated independently without an assistive device. *Id.* Straight leg raises were negative bilaterally. *Id.* She had no reflex, motor, or sensory deficits to the lower extremities. *Id.* However, she rated her back pain as a 6 on a 10-point scale. *Id.* Ledbetter said that they would move forward with left L5 and left L4 selective nerve root block. *Id.* She had limited range of motion of the lumbar spine and a stiff gait. *Id.* Roberts/Ledbetter encouraged her to do stretching exercises daily, advised against bedrest and to resume normal activities as soon as possible. *Id.*

Gayfield returned to Dr. Alvernia on June 8, 2018. (Tr. 648-651). Her symptoms and presentation appeared essentially unchanged. *Id.* Dr. Alvernia assessed back pain, leg pain, lumbar spondylosis, and leg swelling. *Id.* A CT scan of the lumbar region showed congenital hypertrophy and sacralization of the L5 transverse processes with pseudoarthrosis formation to the sacral ala on the left. *Id.* There was no advanced disc space degenerative changes or large disc herniation. *Id.* Rather, there was mild L4-5 and minimal L3-4 foraminal stenosis. *Id.* Alvernia discussed the test results with Gayfield. *Id.* Selective nerve root injections were

---

[4] Gayfield saw a variety of nurse practitioners during her visits to LPC, but they consulted with, and were supervised by Dr. Ledbetter, who also signed off on the visit notes.

pending.  *Id.*

Gayfield underwent left L5 and left L4 selective nerve root blocks on June 13, 2018.  (Tr. 659-660).  However, she reported no improvement.  *Id.*

Gayfield returned to Dr. Alvernia for the last time on June 20, 2018.  (Tr. 652-655).  Her symptoms and examination appeared essentially unchanged.  *Id.*  Alvernia assessed back pain, leg pain, lumbar spondylosis, and leg swelling.  *Id.*  He noted that left L4 and Left L5 selective nerve root injections did not result in significant symptom improvement.  *Id.*  Alvernia recommended a spinal cord stimulator and referred her to pain management for that purpose.  *Id.*

On July 11, 2018, Gayfield saw Donna Courson, FNPC, at LPC for her low back pain.  (Tr. 661-663).  Gayfield reported difficulty rising from a seated position, certain bending forward movements, plus standing and walking.  *Id.*  Courson consulted with Dr. Ledbetter, who recommended going forward with lumbar medial branch blocks.  *Id.*  Courson also recommended walking and stretching.  *Id.*

On July 30, 2018, Gayfield underwent a left lumber medial branch block x3.  (Tr. 664).  However, she experienced no pain relief after the procedure.  *Id.*

On August 6, 2018, Gayfield underwent a right medial branch block x4.  (Tr. 665).  She reported 75 percent pain relief after the procedure.  *Id.*

On August 20, 2018, Gayfield saw Stephen Stansbury, FNP-C, at LPC.  (Tr. 666-668).  Gayfield reported that after the recent procedure she no longer had that much radiculopathy.  *Id.*  However, the pain reduction from the medial branch block had lasted only for about 48 hours.  *Id.*  She had no weakness in her legs.  *Id.*  She had pain with flexion and extension of her back.  *Id.*  She also exhibited some stiffness when walking across the room and walked in a flexed position.  *Id.*  Gayfield was interested in moving forward with right side RF procedures.  *Id.*

14

Worker's compensation recommended an FCE.  *Id.*  However, Stansbury/Ledbetter indicated that she should complete the RF procedures first.  *Id.*

On September 17, 2018, Gayfield underwent a right radiofrequency lumbar medial branch neurotomies x4.  (Tr. 683).

Gayfield returned to Stephen Stansbury, FNP-C, for follow-up on October 15, 2018.  (Tr. 678-680).  Gayfield reported very little reduction in pain after undergoing the right-side lumbar RF procedures.  *Id.*  She was slow to rise from a seated position, and continued to have pain all across her lower back.  *Id.*  She had a flexed position stance.  *Id.*  Any extension of the back produced pain, which radiated to the hips.  *Id.*  However, the pain no longer radiated to her lower extremities.  *Id.*  Worker's compensation was eager to move forward with an FCE.  *Id.*  However, Stansbury/Ledbetter recommended waiting at least four to six weeks after her lumbar RF procedures.  *Id.*  She had no weakness in her lower extremities.  *Id.*  She was encouraged to walk and stretch, and no prescriptions were written.  *Id.*  She was advised against bedrest and to resume normal activities as much as possible.  *Id.*

On November 15, 2018, Gayfield saw Valerie Boyd, FNPC, at LPC, for follow-up for her low back pain.  (Tr. 675-677).  Gayfield reported pain on both sides of her back but seemed to be worse on her left side that day.  *Id.*  Gayfield stated that she had received no benefit from the RF procedures on the right side in September.  *Id.*  She claimed to have been off work since her accident.  *Id.*  Gayfield had difficulty arising from a seated position.  *Id.*  She had no radiation of pain, but a tender left SI joint.  *Id.*  Muscle strength and reflexes were within normal limits and seated straight leg raises were negative.  *Id.*  Despite stating that the lumber RF on the right did not help, she did not complain of pain with quadrant loading on the right.  *Id.*  Boyd/Ledbetter recommended proceeding with lumbar medial branch blocks on the left for confirmation.  *Id.*

15

Although Gayfield underwent that same procedure in June, Boyd/Ledbetter recommended repeating the procedure. *Id.* She still has not had an FCE. *Id.* She occasionally took Aleve and used heat, which helped slightly. *Id.* She also used over-the-counter Lidoderm patches, which also helped slightly. *Id.* She rated her pain as a 7. *Id.* She reported difficulty walking. *Id.* However, motor strength was grossly intact and lumbar sensory was normal. *Id.* Her lumbar range of motion was limited. *Id.* As usual, stretching and walking were recommended. *Id.*

On December 17, 2018, Gayfield underwent a left lumbar medial branch block x4. (Tr. 760). She reported no pain relief as a result of the procedure. *Id.*

On January 3, 2019, Gayfield saw Anderson Austin, FNPC, at LPC for follow-up for her low back pain. (Tr. 757-759). Austin noted that Gayfield had received several different types of diagnosis injections with no significant relief at all. *Id.* She took ibuprofen with minimal relief and wanted to try an e-stim unit. *Id.* A functional capacity evaluation should be considered soon. *Id.* Gayfield had limited range of motion of the lumbar spine, but a normal gait. *Id.*

On February 8, 2019, Gayfield saw Stephen Stansbury, FNP-C, at LPC, for follow-up for her low back pain. (Tr. 754-756). Stansbury noted that Dr. Alvernia had released Gayfield with no further recommendations. *Id.* She had received an e-stim but reported no reduction in pain with that. *Id.* She had no leg pain that day. *Id.* However, there was pain across her lower back in the lumbar facet area. *Id.* She also had pain with flexion and extension. *Id.* She had no hip pain. *Id.* She still was not working. *Id.* At this point, LPC had very little to offer her, and an FCE was requested. *Id.* She was to follow-up in two months. *Id.* Stansbury/Ledbetter recommended walking and stretching. *Id.* She was to resume normal activities as soon as possible. *Id.*

16

On April 4, 2019, Gayfield saw Valerie Boyd, FNPC, at LPC, for follow-up for low back pain.   (Tr. 751-753).  Gayfield denied benefit from any of the procedures performed.  *Id.*  She used a brace.  *Id.*  She had undergone a functional capacity evaluation that indicated she could return to work.  *Id.*  However, Gayfield said that there was no way she could return to work because sitting or standing for any length of time aggravated her pain.  *Id.*  She requested pain medication, instead.  *Id.*  However, Dr. Ledbetter would not prescribe her any narcotic pain medication.  *Id.*  Gayfield rated her pain as a 5 on a 10-point scale.  *Id.*  Her motor strength was grossly intact.  *Id.*  Her lumbar sensory examination was normal, and her lumbar range of motion was limited.  *Id.*  She had a forward flex gait.  *Id.*  Nonetheless, she was encouraged to continue walking and physical therapy.  *Id.*

On May 9, 2019, Gayfield saw Anderson Austin, FNPC, at LPC, for follow-up.  (Tr. 748-750).  Gayfield took ibuprofen as prescribed.  *Id.*  She had discontinued Flexeril because of palpitations.  *Id.*  She was to return in two months.  *Id.*

On July 9, 2019, Gayfield saw Stephen Stansbury, FNP-C, at LPC, for follow-up for low back pain.   (Tr. 745-747).  Gayfield rated her pain as a 5 on 10-point scale.  *Id.*  The functional capacity evaluation had recommended that she return to work.  *Id.*  However, she had not done so.  *Id.*  She had no weakness in the lower extremities.  *Id.*  Her pain across her low back seemed to be more facet pain.  *Id.*  She stood in a flexed position and had pain with any extension and quadrant loading.  *Id.*  No surgery was recommended. *Id.*  She was encouraged to do stretching exercises and to walk.  *Id.*

On November 7, 2019, Gayfield saw Anderson Austin, FNPC, at LPC, for follow-up for low back pain.   (Tr. 773-775).  Austin noted that Gayfield had received a functional capacity evaluation, with a recommendation to return to work under those restrictions.  *Id.*  Gayfield was

working with her attorney to figure out some amicable return to work or disability status, as she had not returned to work. *Id.* Her motor strength was intact. *Id.* Her lumbar range of motion was limited, but her gait was normal. *Id.* No prescriptions were written. *Id.*

On February 18, 2020, Gayfield was seen by Paul Roberts, FNPC, at LPC, for follow-up for low back pain. (Tr. 770-772). Gayfield told Roberts that she had not returned to work and was not going to work. *Id.* Instead, she was seeking disability, and requested an order for her to apply an e-stim unit to her low back, which she was to use while lying on a moist heating pad for 30 minutes, 4x per day for low back pain. *Id.* She wanted an order issued for this. *Id.* She rated her pain as a 7 on a 10-point scale. *Id.* She ambulated independently, without an assistive device. *Id.* Dr. Ledbetter stated that it was okay to give her the order for the e-stim to use with moist heat. *Id.* Nonetheless, Ledbetter encouraged her to return to work status. *Id.* Her lumbar range of motion was within normal limits. *Id.* Her gait was normal. *Id.*

On February 18, 2020, Dr. Ledbetter duly signed an order authorizing Gayfield to apply the e-stim unit to the low back and to use while lying on moist heat pack for up to four times per day for low back pain. (Tr. 778).

On August 4, 2020, Gayfield returned to LPC where she saw Anderson Austin, FNPC, for follow-up. (Tr. 787-788). She reported worsening of her low back pain that radiated across her left buttock and hip area to the left posterior thigh. *Id.* Her pain was worse with standing and/or walking. *Id.* She had settled her workers' compensation claim. *Id.* A lumbar epidural steroid injection was recommended. *Id.* Austin restarted her Gabapentin. *Id.*

On November 3, 2020, Gayfield returned to LPC where she saw Valerie Boyd, FNPC, for follow-up for her low back pain. (Tr. 784-786). She rated her pain as a 4 that day. *Id.* She was self-pay at that time, and unable to move forward with a lumbar epidural steroid injection. *Id.*

Her low back pain extended into the left buttock and hip, which was worse with standing and walking. *Id.* She took ibuprofen 800 mg twice per day, and Neurontin. *Id.* Gayfield had limited lumbar range of motion, secondary to pain. *Id.* She was encouraged to stretch and walk. *Id.*

On February 2, 2021, Gayfield returned to LPC where she saw Anderson Austin, FNPC, for follow-up for left hip pain. (Tr. 781-783). Her pain radiated down the lateral left lower extremity to the left lateral calf. *Id.* Her pain was worse when standing or walking. *Id.* She was not interested in any procedures due to her finances. *Id.* She had not been taking her ibuprofen for the past two months and could not tell any difference with the pain. *Id.* Austin/Ledbetter decided to increase her Gabapentin. *Id.* Her lumbar sensory exam was diminished at left L5. *Id.* She had a stiff gait. *Id.*

On May 4, 2021, Gayfield returned to LPC where she saw Valerie Boyd, FNPC, for follow-up for hip pain and low back pain. (Tr. 790-792). Gayfield denied any numbness, tingling, or weakness. *Id.* She stated that her TENS unit helped. *Id.* She declined any procedures because she was self-pay. *Id.* Her medications did offer her some quality of life and functionality. *Id.* She rated her pain as a 6. *Id.* Her lumbar range of motion was limited secondary to pain. *Id.* Seated straight leg raise was positive on the left side. *Id.* She was encouraged to stretch and walk. *Id.*

## Analysis

Gayfield sets forth three assignments of error:

1. **The ALJ's residual functional capacity assessment is not supported by substantial evidence;**

2. **The ALJ erroneously evaluated the medical opinion evidence of record; and**

3. **The Acting Commissioner did not meet her burden at step five of the sequential evaluation process.**

19

The court will combine the first two assignments of error for purposes of discussion because they both pertain to the ALJ's RFC determination.

## I.    RFC

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, the medical treatment history, and the findings of the non-examining agency physician, James Crout, M.D. -- the lone physician of record to consider the effects of Gayfield's impairments on a function-by-function basis.  (Tr. 16-19).  Ultimately, the ALJ found Dr. Crout's opinion to be partially persuasive and used it as a foundation for his RFC determination, which he reduced to work at the sedentary level, with a sit/stand option.  *Id*.  The ALJ also credited statements from Gayfield's treating orthopedist, Dr. Brown, that she was limited to "light duty."  *Id*.

Gayfield challenges the ALJ's RFC on various grounds.  First, she argues that the ALJ failed to comply with Social Security Ruling 96-8p, which specifies, *inter alia*, that the RFC must be a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8P (July 2, 1996) ("SSR 96-8p").  Here, however, the ALJ relied, in no small part, upon the RFC completed by the state agency physician, which contained a general evaluation of Gayfield's impairments, and a function-by-function analysis of the limitations imposed by those impairments.  This medical report, when combined with the ALJ's appraisal of the testimony and the remainder of the record satisfies the requirements of SSR 96-8p, and its associated regulations.  *Beck v. Barnhart*, 205 Fed. App'x. 207, 214 (5th Cir. 2006) (citation omitted); *Onishea v. Barnhart*, 116 Fed. App'x. 1, 2 (5th Cir.

20

2004) (an RFC assessment based in part on the function-by-function analysis of claimant's exertional limitations contained in a state consultant's medical report satisfies the legal standard set forth in SSR 96–8p).

Gayfield next faults the ALJ for failing to explain the basis for a sit/stand option comprised of sitting for 30 minutes before standing for one minute, instead of a more flexible "as needed" sit/stand option. However, the ALJ stated that he assigned the option because it would help alleviate any pain Gayfield might experience whilst working. *See* Tr. 19. As for the 30-minute limit, it was Gayfield who testified that she could sit for up to 30 minutes at a time. (Tr. 43).

Gayfield also criticizes the ALJ for incorrectly reciting that she had testified that she was unable to perform any activities and had to lie in bed for eight hours during the day to relieve her pain. (Tr. 17). However, the foregoing statement first appeared in the prior ALJ's initial decision. *See* Tr. 76. Moreover, the hearing transcript associated with that initial decision is not in the record, and, thus, Gayfield may well have made that statement. However, even accepting Gayfield's apparent representation that she did *not* make that statement, she did write in a function report that after finishing breakfast, she would recline in a recliner until she had to retrieve her daughter from school at noon. (Tr. 347). Furthermore, at the second hearing, Gayfield testified that she needed to alternate between lying down and sitting throughout the day. (Tr. 47). Clearly, Gayfield's professed need to recline or lie down for at least half the day is not materially different from a credibility or functional capacity perspective than the need to lie in bed all day.

Of course, Gayfield further implies that the ALJ's tainted credibility determination also influenced his tacit rejection[5] of her need to use an e-stim/TENS unit up to four times per day.[6] Gayfield testified that, by 5:00 p.m. daily, she has used the e-stim TENS unit three times, together with a moist heating pad, for an hour per treatment. *See* Tr. 46-49.  Even so, there is no apparent reason why Gayfield could not use the e-stim TENS unit once in the morning before work, during her lunch break,[7] and then right after work.

The court further notes that Gayfield brought up the frequency and length of her e-stim TENS unit during her February 18, 2020 appointment at Dr. Ledbetter's office, which also happened to be the same visit where she told the nurse practitioner that she had not returned to work, was not going to work, and, instead, was seeking disability.  (Tr. 770-772).  Gayfield, who, by then, was represented by present counsel, proceeded to request a detailed order from Dr. Ledbetter requiring her to apply e-stim unit to her low back, which she was to use while lying on a moist heating pad for 30 minutes, 4x per day for low back pain.  *Id.*   While Dr. Ledbetter acceded to Gayfield's conspicuously specific request (considering she already was using an e-stim unit without the need of an order), he nonetheless encouraged her to return to work status.

---

[5] The ALJ included the customary phrase that the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully consistent with the overall record.  (Tr. 18).

[6] In fact, she complains that the ALJ failed to meaningfully address her use of an e-stim TENS unit at all.

[7]  Of course, Gayfield will have to decrease the length of her mid-day treatment session because lunch breaks ordinarily last only 30 minutes.  However, when Gayfield asked Dr. Ledbetter for an order authorizing her e-stim TENS unit in 2020, she stated she only needed it for 30 minutes at a time.  *See* Tr. 770 and discussion, *infra*.

22

*Id.* In short, the record contains ample support for the ALJ's implicit rejection of Gayfield's self-imposed e-stim treatment requirements.

Gayfield further contends that the ALJ failed to address whether she could sustain employment on a regular, ongoing basis. *See Watson v. Barnhart*, 288 F.3d 212, 218 (5th Cir. 2002) and *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). However, the Fifth Circuit has made it clear that "nothing in *Watson* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case." *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005) (citation omitted). For the requirement in *Watson* to be triggered, the claimant's physical ailment must wax and wane in its manifestation of disabling symptoms. *Id.*[8] In the absence of such a showing, the claimant's ability to maintain employment is subsumed in the RFC determination. *Perez, supra.* Gayfield has not made the requisite showing here.

Gayfield next argues that the ALJ erred when he essentially stated that her statements regarding her symptoms were out of proportion to the objective medical evidence. The court observes that a claimant's statements about her pain or other symptoms, alone, do not suffice to establish disability. 20 C.F.R. § 404.1529(a).[9] Rather, there must be objective medical

---

[8] Even medical evidence that the claimant has "frequent and unpredictable" relapses and "classical waxing and waning of low back symptomology," does not suffice to necessitate a separate finding of ability to maintain employment. *Heck v. Colvin*, 674 Fed. App'x. 411, 416 (5th Cir. 2017); *see also Halley v. Barnhart*, 158 Fed. App'x. 645, 648 (5th Cir. 2005); *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003).

[9] In 2016-2017, the Commissioner issued a new social security ruling that dispensed with the term "credibility" because it was not used in the regulations. *See* SOC. SEC. RULING 16-3P TITLES II & XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS, SSR 16-3P (Oct. 25, 2017).

23

evidence from an acceptable medical source to show that the claimant has medical impairment(s) that reasonably could be expected to produce the pain or other symptoms alleged. *Id*. Further, "[o]nce a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity." *Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir.1995) (citing *inter alia*, 20 C.F.R. § 404.1529).

When assessing disability, the ALJ is required to consider all symptoms, including pain, and the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence, together with other evidence. 20 C.F.R. § 404.1529(a). In evaluating the intensity of symptoms, including pain, the ALJ will consider all available evidence such as medical history, medical signs and laboratory findings, and statements about how the symptoms affect the claimant. *Id*. The ALJ also must consider inconsistencies in the evidence and conflicts between the claimant's statements and the remainder of the evidence. 20 C.F.R. § 404.1529(c)(4). However, the ALJ need not follow formalistic rules in his assessment. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

Relatedly, pain is considered disabling under the Social Security Act only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Selders v. Sullivan*, 914 F.2d 614, 618-619 (5th Cir. 1990). The ALJ's decision regarding the actual extent of a claimant's complaints of pain is entitled to considerable judicial deference if supported by substantial evidence. *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991). Factors that the ALJ may consider in evaluating the claimant's subjective complaints include: (1) claimant's daily activities; *Falco v. Shalala*, 27 F.3d 160 (5th Cir. 1994); *Anthony v. Sullivan*, 954 F.2d 289, 296 (5th Cir. 1992); *Reyes v. Sullivan*, 915 F.2d,

151, 155 (5th Cir. 1990); (2) medication the claimant takes for pain; *Anthony v. Sullivan, supra; Villa v. Sullivan,* 895 F.2d 1019, 1024 (5th Cir. 1990); (3) degree of medical treatment; *Villa, supra; Nickerson v. Secretary of Health and Human Services*, 894 F. Supp. 279 (E.D. Tex. 8/3/1995); (4) lack of medical opinions in the record indicating the claimant is precluded from performing the level of activity indicated by the ALJ; *Villa, supra;* (5) external manifestations of debilitating pain such as marked weight loss; *Falco, supra*; and (6) other factors, *see* 20 C.F.R.§ 404.1529(c)(3)(i)-(vii).

Gayfield contends that the ALJ inaccurately summarized the medical evidence and failed to consider the many procedures she underwent in an effort to obtain relief.  It is manifest that "the ALJ must *consider* all the record evidence and cannot 'pick and choose' only the evidence that supports his position."  *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citations omitted) (emphasis added).  At the same time, however, "the ALJ need not *discuss* every piece of evidence in the record."  *Bordelon v. Shalala*, 41 F.3d 661, 1994 WL 684574 (5th Cir. Nov. 15, 1994) (unpubl.) (emphasis added).  Indeed, even an ALJ's failure to discuss such seemingly material evidence as the opinions of a medical and a vocational expert does not require remand where the ALJ stated that the opinion was based on consideration of evidence in the entire record.  *Daniels v. Apfel*, 181 F.3d 97, 1999 WL 346976 (5th Cir. May 20, 1999).

Here, the ALJ acknowledged that he considered the "entire record" and "all the evidence" therein.  (Tr. 14-15).  He also noted the various procedures and treatments that Gayfield underwent, plus her inability to afford a further procedure(s).  *See* Tr. 17.  Ultimately, however, the ALJ exercised his prerogative and discretion to favor the opinions of the state agency physician and Gayfield's treating physician(s).

Realizing that the medical opinion evidence undermines her allegations of disability, Gayfield further argues that the ALJ erred in his evaluation of the medical opinion evidence because he found Dr. Crout's opinion "partially persuasive," but then neglected to reconcile Dr. Crout's alleged determination that Gayfield's "statements regarding symptoms" was "fully consistent."  However, Dr. Crout found that Gayfield had shoulder-related limitations and the ability to perform sedentary work, which was consistent with Gayfield's complaints at that time, including her statements on her disability questionnaire.  *See* Tr. 347 (admitted that she could sit and watch television for up to two hours at a time).  Over time, Gayfield's shoulder symptoms improved, *see* Tr. 51, while her testimony regarding her capacity for work deteriorated.  In fact, only one month after Dr. Crout issued his opinion, Gayfield's assessment of the severity of her condition had worsened.  *See* Tr. 362.  In short, the ALJ did not err by failing to reconcile any alleged inconsistency in Dr. Crout's opinion.

Moreover, Dr. Crout was not the only physician of record to opine that Gayfield was capable of work.  As the ALJ aptly noted, none of Gayfield's physicians endorsed the severely restricted lifestyle urged by Gayfield.  (Tr. 18).  To the contrary, the ALJ found persuasive Dr. Brown's opinion that from July to September 2017, Gayfield was limited to "light duty."  (Tr. 19).  Gayfield cries foul because it is not known what Dr. Brown meant by "light duty."  However, the ALJ acknowledged the lack of details regarding Dr. Brown's statement but credited it for the purpose of showing that Dr. Brown did not believe that Gayfield was so limited in her ability to function that she would be precluded from all work.  (Tr. 19).  Moreover, while "light duty" is ill-defined, the ALJ's RFC  specified a limited range of sedentary work, which is less physically demanding than work at the "light" exertional level.  In other words,

26

whatever "light duty" may mean, it certainly is broad enough to encompass, at minimum, limited sedentary work, which is the most restricted level of work recognized by the Commissioner.[10]

Gayfield makes much of the fact that Dr. Brown stated that Dr. Alvernia was to follow her and determine her ability to work. *See* Tr. 636-638. As it turns out, Dr. Alvernia saw Gayfield on only three occasions before turning her care over to Dr. Ledbetter at LPC. Moreover, shortly before her April 4, 2019 visit at LPC, Gayfield finally underwent a functional capacity evaluation ("FCE") that indicated that she was able to return to work – an opinion that Dr. Ledbetter shared. *See* Tr. 770. In other words, although Dr. Brown stated that he was deferring ability to work to Dr. Alvernia, Dr. Alvernia tendered Gayfield's care to Dr. Ledbetter, who ultimately supported an FCE for her return to work.

In the end, it is clear that the ALJ grounded his decision on the opinions of the non-examining agency physician and Gayfield's treating physicians. The court finds that the ALJ's assessment of Gayfield's subjective complaints and symptoms satisfied the requirements of 20 C.F.R. § 404.1529, and that his determination is supported by substantial evidence. *See Giles v. Astrue*, 433 Fed. App'x. 241, 249 (5th Cir. 2011) (ALJ's appraisal of plaintiff's subjective complaints is supported by his discussion of medical records and opinions); *Herrera v. Comm'r of Soc. Sec.*, 406 Fed. App'x. 899, 905–06 (5th Cir. 2010) (ALJ complied with SSR 96-7p [now SSR 16-3p] by thorough consideration and discussion of the relevant medical evidence); *Undheim v. Barnhart*, 214 Fed. App'x. 448 (5th Cir. 2007) (opinion as a whole gave sufficient

---

[10] It is also worth noting that at her final visit to Dr. Brown on May 21, 2018, Brown indicated that, although she was off work, Gayfield was restricted to "medium" work, with no overhead left arm. *See* Tr. 636-638. Of course, medium work exceeds the physical requirements of sedentary and even light work.

reasons and documentation for the ALJ's resolution of subjective evidence); *Cornett v. Astrue*, 261 Fed. App'x. 644 (5th Cir. 2008) (ALJ gave some weight to claimant's complaints; thus claimant's arguments that his subjective complaints were not given enough weight is unavailing); *Hernandez v. Astrue*, 278 Fed. App'x. 333 (5th Cir. 2008) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion).

## II.    Step Five

Gayfield's remaining assignment of error represents but another permutation of her contention that the ALJ erred in his RFC assessment. She asserts, in effect, that the ALJ ignored the VE's testimony that was elicited in response to hypotheticals that included additional limitations of functioning in excess of the ALJ's RFC. *See* Tr. 35.    However, the VE's testimony regarding the effects of additional or different limitations not adopted by the ALJ in his RFC, prove immaterial, so long, as here, the ALJ's RFC is supported by substantial evidence. *See* discussion, *supra*; *Vaught v. Astrue*, 271 Fed. App'x. 452, 456 (5th Cir. 2008) (plaintiff's argument amounts to a disagreement with the ALJ's RFC, but that determination was supported by substantial evidence). Furthermore, a hypothetical need only reasonably incorporate the disabilities and limitations recognized by the ALJ. *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994). In short, Gayfield's final assignment of error, like her others, lacks merit.

## <u>Conclusion</u>

The ALJ in this case was tasked with determining whether the claimant was disabled. In so doing, he considered the hearing testimony, the medical records, and the expert opinion evidence. The evidence was not necessarily uniform, and according to Gayfield, should have compelled a different result. However, conflicts in the evidence are for the Commissioner to

resolve.  *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted).  This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs *against* the Commissioner's decision."  *Newton, supra* (emphasis added).[11]  That is not to say that the Commissioner's decision necessarily is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).[12]

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant is not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error.  Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of

---

[11] Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below."  *January v. Astrue,* 400 Fed. App'x. 929 (5th Cir. 2010) (citation omitted).  One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result.  *Id*.  This exception is applicable here.

[12] Procedural improprieties "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision."  *Morris v. Bowen,* 864 F.2d 333, 334 (5th Cir. 2007).

filing.  Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 10th day of February, 2023.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE